# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**JACOB ALLEY,** *et al.,*

      **Plaintiffs/Counterrespondents,**

**v.**                                  **Civil Action No. 3:20cv355**

**QUALITY ECO TECHNOLOGIES, LLC,**

      **Defendant/Counterclaimant.**

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court on two motions:

(1)    Defendant and Counterclaim-Plaintiffs Quality Eco Technologies, LLC's ("QET") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)[1] (the "QET Motion to Dismiss") (ECF No. 8); and,

(2)    Plaintiffs and Counterclaim-Defendants Jacob Alley, Paul Atkinson, and Christian Bratton's (collectively, the "Installers") Motion to Dismiss Counterclaims pursuant to Rule 12(b)(6) (the "Motion to Dismiss Counterclaims"), (ECF No. 12).

The Installers responded to the QET Motion to Dismiss, (ECF No. 11), and QET replied, (ECF No. 14). QET responded to the Motion to Dismiss Counterclaims, (ECF No. 15), and the Installers replied, (ECF No. 16). These matters are ripe for disposition.

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2] For the reasons that follow the Court

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Installers assert

will grant in part and deny in part the QET Motion to Dismiss and grant the Motion to Dismiss Counterclaims in its entirety.

## I. Factual and Procedural Background

Because the Court addresses the QET Motion to Dismiss and the Motion to Dismiss Counterclaims separately, and each Motion requires the Court to accept certain well-pleaded factual allegations as true, the Court recounts the factual and procedural backgrounds for the Motions in separate sections.

### A.   QET Motion to Dismiss the Installers' FLSA Claims

#### 1.   Factual Background[3]

Plaintiffs, who worked as "Installers" for QET, bring this FLSA collective action against QET on behalf of themselves and others similarly situated.[4]  (Am. Compl. ¶ 2, ECF No. 3.)  The Installers allege that QET required them, as a part of their job tasks, to make long drives and

---

claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19.  (Am. Compl. ¶ 9, ECF No. 3.)  For the reasons stated below, the Court declines to exercise supplemental jurisdiction over the Counterclaims, finding they are not "so related to the [FLSA] claims . . . that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

[3] For the purpose of the QET Motion to Dismiss, the Court will accept the well-pleaded factual allegations in the Installers' Amended Complaint as true, and draw all reasonable inferences in favor of the Installers.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[4] Plaintiff Installers state that they "bring this action on behalf of themselves and other similarly situated current and Installers of Defendant pursuant to 29 U.S.C. § 216(b)."  (Am. Compl. ¶ 4.)  The Amended Complaint defines "similarly situated employees" as "individuals who were, or are, employed by Defendant as 'Installers' or 'Installation Techs,' or with duties similar to 'Installers' or 'Installation Techs,' within the three years preceding the filing of th[e] [C]omplaint."  (*Id.*)

2

perform large volumes of work, resulting in their working overtime hours. (*Id.* ¶¶ 5–7.) The Installers argue that because QET "misclassifies Installers as independent contractors" and pays them only commission, QET "failed to pay them minimum wages as well as owed overtime." (*Id.* ¶ 27.)

QET operates as a Virginia business that "provid[es] and install[s] eco-friendly ventilation, air filtration, insulation, and power conservation products to residential and commercial customers." (*Id.* ¶ 4.) Plaintiffs all worked as "Installers" with QET at overlapping times.[5] The Installers each "worked out of [QET's] Richmond area operations but serviced customers up and down the Eastern United States." (*Id.* ¶¶ 5–7.) In their roles, the Installers' job tasks included the "manual installation and delivery of insulation, air filtration, and ventilation products and systems." (*Id.* ¶ 29.) The Installers allege that QET regularly required them to take long drives "to and from out of town jobs" and perform a "large volume of jobs," which often "required [them] to work in excess of forty (40) hours a week." (*Id.* ¶¶ 23, 31.)

Despite being classified as "independent contractors," the Installers allege that they actually functioned as employees because they retained little control over their schedules and job tasks at QET. For example, QET assigned them to certain projects, and the Installers "did not have any control over the hours they worked." (*Id.* ¶ 25.) While performing their job duties, the Installers allegedly wore "QET uniform[s], typically drove QET vehicles, and used QET tools and supplies." (*Id.* ¶ 26.) QET also provided Installers with "a QET credit card for those instances when supplies or tools had to be purchased." (*Id.*) Further, QET trained the Installers

---

[5] Alley worked as a QET Installer "from February 20, 2018 through February 25, 2019." (*Id.* ¶ 5.) Atkinson worked as a QET Installer "from January 10, 2019 through the present." (*Id.* ¶ 6.) Similarly, Bratton worked as a QET Installer "from March 7, 2018 through the present." (*Id.* ¶ 7.) At the time they filed the present action, both Atkinson and Bratton remained on furlough status. (*Id.* 3 n.3.)

about its products and "how to perform said installations." (*Id.* ¶ 24.) Finally, QET required the Installers "to sign a non-compete agreement prohibiting them from performing work for any QET competitors both during, and for a time period after, their employment with QET." (*Id.* ¶ 25.)

The Installers allege that because QET classified them as independent contractors, QET paid them on a commission basis and did not guarantee them a weekly payment equivalent to the minimum wage. (*Id.* ¶¶ 27, 32.)[6]  In general, the Installers assert that QET had both "knowledge" and a "policy and practice of misclassifying Installers and/or Installation Techs as independent contractors and not properly compensating them with minimum and overtime wages due for work performed for [QET's] benefit." (*Id.* ¶¶ 34, 38.)

Additionally, the Installers allege that after learning of the present lawsuit, QET retaliated against Plaintiffs Atkinson and Bratton by terminating their employment contracts.  On May 19, 2020, the Installers initiated the instant action. (*Id.* ¶ 50.)  On May 20, 2020, the next day, QET's owner reached out to Atkinson and Bratton to discuss taking them off furlough status. (*Id.* ¶ 51.)  For instance, at 12:54 p.m., QET owner text messaged Bratton, "Are you ready to start working." (*Id.*)  Atkinson alleges he received a similar message about starting work "in Pennsylvania and Maryland." (*Id.*)  Later, QET's owner contacted both Atkinson and Bratton to let them know he had become aware of the instant action and informed them both they were "no longer welcome at QET." (*Id.* ¶ 52.)  Specifically, QET's owner texted Atkinson, "our atty just reached out to us.  I guess you're looking for a lawsuit and working together?" (*Id.*)  As to Bratton, QET's owner texted him:

---

[6] Plaintiffs do not provide QET's commission structure or allege how much QET paid them in commission. (*See generally* Am. Compl.)

4

> [Y]ou ended the relationship when you wanted to sue us. . . .  The moment you decided to sue us, you're claiming that you're being mistreated and underpaid.  So yes, you are ending your relationship with us. . . .  Yes, I did remove you after your lawsuit.  What's there to pretend about?

(*Id.* ¶ 54.)

The Installers assert three FLSA violations against QET:

(1)   **Count I:**  Nonpayment of minimum wage (the "Minimum Wage Claim");

(2)   **Count II:**  Nonpayment of overtime wages (the "Overtime Wage Claim"); and,

(3)   **Count III:**  Retaliation for filing a lawful claim under the FLSA (the "Retaliation Claim").

(*See generally id.*)  The Installers seek "statutory damages equal to the mandated overtime premium pay within three (3) years preceding the filing of th[e] Complaint."  (*Id.* ¶ 46.)  The Installers also request that the Court "[d]esignate this action as a collective action on behalf of the FLSA collective class."  (*Id.* 11.)

### 2.   Procedural Background as to the Motion to Dismiss the Amended Complaint

On May 19, 2020, the Installers filed their collective action in this Court.  (ECF No. 1.) On June 23, 2020, within twenty-one days of receiving the summons, the Installers amended their Complaint as of right.  (ECF No. 3.)  On July 20, 2020, QET filed the Motion to Dismiss. (ECF No. 8.)  On August 3, 2020, the Installers timely responded to the QET Motion to Dismiss, (ECF No. 11), and QET replied, (ECF No. 14).  For the reasons that follow, the Court will grant in part and deny in part the QET Motion to Dismiss.

### B.   The Installers' Motion to Dismiss QET's Counterclaims

#### 1.   Factual Background[7]

QET brings six state law counterclaims (the "Counterclaims") against the Installers to recover damages "suffered by QET as a direct result of wrongdoing and misconduct engaged in by [the Installers] while acting . . . on behalf of QET." (Countercls. ¶ 1, ECF No. 10.)  QET asserts that this Court has supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(a).[8]  (*Id.* ¶ 4.)

Between 2018 and 2020, QET entered into contracts with homeowners in various states. (*Id.* ¶ 6.)  QET hired the Installers "to install the QET products" as directed by these contracts. (*Id.*)  QET alleges that the Installers therefore owed it "a duty to install QET's products in customer's homes in a workmanlike manner and in accordance with customary standards in the industry" and to "repair any and all defects that arose as a result of substandard work."  (*Id.* ¶ 7.)  QET alleges that the Installers' performance and conduct related to these contracts was deficient in four ways.

First, QET alleges that the Installers breached these duties because their work "on many jobs was inferior, deficient and in breach of customary standards in the industry."  (*Id.* ¶ 8.)  QET alleges it received "numerous complaints about the substandard work," including issues with:

---

[7] For the purpose of the Motion to Dismiss Counterclaim, the Court will accept the well-pleaded factual allegations in QET's Counterclaims as true, and draw all reasonable inferences in favor of QET.  *Kensington Volunteer Fire Dep't, Inc.*, 684 F.3d at 467 ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440).

[8] "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a).

"improper installation of systems and products, leaking systems, gaps in multi-layer insulation

('MLI'), errors programming expanded polystyrene ('EPS') foam, spillage of mold treatment on

a customer's couch and floor, and many other damages to customer's homes and property." (*Id.*

¶ 9.)  For example, QET cites one instance in which "Atkinson's work was so deficient that part

of the customer's ceiling fell in, necessitating a $4,000 refund.  Atkinson refused to return

customer's calls and routinely failed to show-up when he had promised to repair his defective

work." (*Id.*)  As a result, QET alleges Atkinson caused it "to incur legal fees and costs." (*Id.*)

Additionally, QET states that the Installers' alleged breaches required it to "engage[] technicians

to repair and replace the defective work at great cost and expense." (*Id.* ¶ 10.)

Second, QET alleges that Alley defamed QET to two QET employees at a local gas

station. (*Id.* ¶¶ 11–13.)  On July 7, 2020, two QET employees were stopped to fuel up one of

QET's company vehicles "when Alley drove by and spotted the QET van." (*Id.* ¶ 11.)  Alley

allegedly stopped at the gas station to talk with the QET employees. (*Id.*)  During their

conversation, Alley told the QET employees that QET "stole" from him and that QET was

"scamming people." (*Id.* ¶ 12.)  Alley further stated that QET had changed its name three or four

times because of "shady business practices and because of QET's terrible online reputation."

(*Id.* (quotations omitted).)  Lastly, Alley told the QET employees that QET had "begged him not

to leave the company and continued to beg him to come back to work for QET for weeks after he

left." (*Id.*)

Third, QET avers that the Installers "each defrauded and stole from QET." (*Id.* ¶ 13.)

Specifically, QET alleges that the Installers "deliberately padded invoices in order to receive

higher commissions." (*Id.*)  For instance, QET states that the Installers "added different

7

commission-able items to their invoices every week . . . [and] QET found out that [the Installers] did not actually install the items." (*Id.*)

Finally, QET alleges that it "learned from customers that Alley was high on the job." (*Id.* (quotations omitted).) As such, QET states that it terminated Alley "due to his poor quality work, fraud, deceit and theft." (*Id.*)

As a result, QET brings six counterclaims against the Installers:

(1)   **Count I:** Breach of Contract—the Installers breached their contract to QET when they failed to perform under the standards expected in the industry;

(2)   **Count II:** Implied Indemnity—the Installers "each owe QET an implied duty to indemnify and hold QET harmless from the damage they caused;"

(3)   **Count III:** Negligence—the Installers failed to install QET's products in a reasonably prudent manner;

(4)   **Count IV:** Breach of Fiduciary Duty—the Installers breached their fiduciary duty to act in good faith and with due regard for QET's rights and interests;

(5)   **Count V:** Conversion—the Installers wrongfully exterted dominion over QET's property and obtained unlawful possession of QET's funds by falsifying invoices; and,

(6)   **Count VI:** Defamation—Alley defamed QET when he told two QET employees that QET had a "shady" business reputation and "stole" from him.

(*Id.* 7–10.) QET seeks compensatory damages in the amount of $1,000,000 and punitive damages in the amount of $350,000, along with post-judgment interest. (*Id.* 10.)

### 2.   Procedural Background as to the Motion to Dismiss the Counterclaims

On July 20, 2020, the same day QET filed its Motion to Dismiss, it filed the six Counterclaims. (ECF No. 10.) On August 10, 2020, the Installers filed the Motion to Dismiss Counterclaims. (ECF No. 12.) QET responded, (ECF No. 15), and the Installers replied, (ECF

8

No. 16).  For the reasons that follow, the Court will grant the Motion to Dismiss Counterclaims in its entirety.

## II.  Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a Complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a Complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the Complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted).  The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at

9

467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the Complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus.*, 637 F.3d at 440)).

### III.  Analysis

The Court addresses the QET Motion to Dismiss and Motion to Dismiss Counterclaims separately.  For the reasons that follow, the Court will grant the QET Motion to Dismiss as to Counts I and II, but deny the Motion as to Count III.  The Court concludes that the Installers do not plausibly allege facts to show a reasonable inference of minimum wage and overtime violations and will dismiss those claims without prejudice.  But, drawing all reasonable inferences in favor of Plaintiffs Atkinson and Bratton, the Court finds that they plausibly allege that QET retaliated against them by terminating their employment contracts.

The Court will then grant the Installers' Motion to Dismiss Counterclaims in its entirety, the Court finds, alongside other courts in the Eastern District of Virginia, that it lacks jurisdiction over QET's Counterclaims because the Counterclaims do not arise out of the same transaction or occurrence as the Installers' FLSA claims.

### A.     The Court Will Grant in Part and Deny in Part the QET Motion to Dismiss

QET challenges the sufficiency of the Installers' Amended Complaint on several grounds.  First, the Court will address the threshold question of whether QET engaged the Installers as employees.  Assuming all factual allegations as true and drawing all reasonable inferences in favor of the Installers, the Court finds that QET engaged the Installers as employees as opposed to independent contractors.  Second, the Court will dismiss the Minimum Wage Claim in Count I and the Overtime Wage Claim in Count II because the Installers do not plausibly allege facts to state a claim for relief under the FLSA.

10

Finally, the Court concludes that Plaintiffs Atkinson and Bratton allege facts that support a reasonable inference that QET retaliated against them by terminating their contracts after learning of the instant action. Therefore, the Court will grant the QET Motion to Dismiss Counts I and II, but deny the Motion as to Count III.

### 1. **Legal Standard: Fair Labor Standards Act (the "FLSA")**

Congress enacted the FLSA to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (citation omitted). "[B]ecause the Act is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals." *Id.* (internal citation and quotation marks omitted). Specifically, "[t]he FLSA imposes minimum wage and maximum hour requirements on employers." *Seagram v. David's Towing & Recovery, Inc.*, 62 F. Supp. 3d 467, 473 (E.D. Va. 2014) (citing 29 U.S.C. §§ 206 and 207).

To recover under the FLSA, a plaintiff must establish an employer-employee relationship within the meaning of the FLSA to prevail in her or his FLSA suit. *Kerr v. Marshall Univ. Bd. of Govs.*, 824 F.3d 62, 83 (4th Cir. 2016). Although the FLSA defines the terms employer,[9] employee,[10] and employ,[11] "there is . . . no definition that solves problems as to the limits of the employer-employee relationship under the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947). The Supreme Court of the United States has stated: "The definition of

---

[9] The FLSA defines an "employer," in relevant part, as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

[10] "The term 'employee' means any individual employed by an employer." § 203(e)(1).

[11] "'Employ' includes to suffer or permit to work." § 203(g).

'employ' is broad." *Id.* Similarly, the FLSA even applies to informal and loose employment relationships. *See, e.g., Griffin v. Daniel*, 768 F. Supp. 532, 538–40 (W.D. Va. 1991).

The United States Court of Appeals for the Fourth Circuit directs a court to apply the Economic Reality Test when assessing a FLSA claim, which "focuses on whether the worker is 'economically dependent on the business to which [she or] he renders service or is, as a matter of economic [reality], in business for [her- or] himself." *Kerr*, 824 F.3d at 83 (quoting *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (brackets in original)).  Under the Economic Reality Test, also known as the "*Silk* Test,"[12] a court should consider six non-exhaustive factors:  "(1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business." *Schultz*, 466 F.3d at 304–05.

Because "no one factor is dispositive," *Griffin*, 768 F. Supp. at 539, the Court must consider as the "ultimate question posed by the *Silk* Test:  whether the agents were, as a matter of economic reality, dependent on the business they served, or, conversely, whether they were in business for themselves," *Schultz*, 466 F.3d at 305.

---

[12] "This Court follows the six-factor test set forth in *United States v. Silk*, 331 U.S. 704 (1947), *abrogated in part by* 503 U.S. 318 (1992), to determine whether a worker is an independent contractor or employee for purposes of the FLSA." *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 137 (4th Cir. 2017) (citation omitted).

### 2. The Installers Plausibly Allege That QET Engaged Them As "Employees" Under the FLSA

Reading the Amended Complaint favorably, the Installers demonstrate that QET engaged them as "employees" under the *Silk* Test. *Schultz*, 466 F.3d at 304. The Amended Complaint supports the reasonable inference that the Installers, through their role with QET, economically depended on their work with QET, retained little control over their jobs and duties, invested little in QET, and rendered services integral to QET's business. *See McFeeley v. Jackson Street Ent.*, 825 F.3d 235, 242 (4th Cir. 2016) (finding defendant acted as employer under FLSA when it, among other things, required workers to follow written guidelines, set fees for workers, and dictated workers' schedules).

In looking to the first *Silk* factor, "the degree of control that the putative employer has over the manner in which the work is performed," the facts presented in the Amended Complaint create a reasonable inference that QET exercised substantial control over the manner in which the Installers worked. *Schultz*, 466 F.3d at 304. For instance, QET trained the Installers about its products and "how to perform said installations." (Am. Compl. ¶ 24.) Then, QET assigned Installers their jobs and tasks, leaving Installers little control over their own schedules. (*Id.* ¶ 25.) QET also required Installers to take long drives "to and from out of town jobs" and perform a "large volume of jobs," which regularly "required [the Installers] to work in excess of forty (40) hours a week." (*Id.* ¶¶ 23, 31.) Perhaps most persuasively, QET required the Installers, despite their role as independent contractors, "to sign a non-compete agreement prohibiting them from performing work for any QET competitors both during, and for a time period after, their employment with QET." (*Id.* ¶ 25.) The first *Silk* factor weighs in favor of finding that the Installers functioned as QET employees.

As to the second *Silk* factor, "the worker's opportunities for profit or loss dependent on his [or her] managerial skill," the Amended Complaint does not show that the Installers' opportunities for profit or loss depended on their managerial skill. *Schultz*, 466 F.3d at 304. The Installers only allege that they received commission. The Installers do not provide that such commission included opportunities for the Installers to earn more or less depending on the skill with which they performed their duties. *See Schultz*, 466 F.3d at 307 (finding, in discussing the second *Silk* factor, "no evidence [the workers] could exercise or hone their managerial skill to increase their pay"). For example, the Installers do not allege that they "set prices for, or sold or promoted, the products they were made to install on their assigned installations." (*See* Resp. QET Mot. Dismiss 4, ECF No. 11.) Therefore, the second *Silk* factor weighs in favor of finding that the Installers functioned as QET employees.

As to the third *Silk* factor, "the worker's investment in equipment or material, or his employment of other workers," the Court finds that the Installers' roles did not allow them to invest in QET material or equipment. *Schultz*, 466 F.3d at 304. While performing their job duties, the Installers wore "QET uniform[s], typically drove QET vehicles, and used QET tools and supplies." (*Id.* ¶ 26.) QET supplied the Installers with a credit card in case they needed to purchase equipment or materials on the job. Indeed, no facts that the QET allowed the Installers to employ other workers to assist in the completion of tasks. As such, the third *Silk* factor also weighs in favor of a finding that they functioned as QET employees.

Although the Installers do not state facts in support of the fourth and fifth *Silk* factors, the degree of skill required for the work and the permanence of the working relationship, the Court observes that the services the Installers rendered plausibly comprised an integral part of QET's business under the sixth *Silk* factor. *Schultz*, 466 F.3d at 304. The Installers tasks included

14

"delivering and installing . . . materials and/or devices a customer had ordered from QET." (Am. Compl. ¶ 21.) Certainly, such installations constituted an integral part of QET's business as a provider and installer of "eco-friendly ventilation, air filtration, insulation, and power conservation products to residential and commercial customers."[13] (*Id.* ¶ 4.)

Considering the *Silk* factors, and keeping in mind the ultimate question posed by the *Silk* Test—"whether the agents were, as a matter of economic reality, dependent on the business they served, or, conversely, whether they were in business for themselves," *Schultz*, 466 F.3d at 305—the Court concludes that the Installers state a claim that QET engaged them as "employees" under the FLSA. Specifically, QET, by controlling the Installers' job tasks and schedule; training the Installers on QET standards; providing the Installers with uniforms, vehicles, and credit cards; and, depending on the Installers to perform an integral part of its business, made the Installers "dependent on the business they served." *Schultz*, 466 F.3d at 305. Because the Court concludes, in a light most favorable to the Installers, that QET engaged them as employees, the Court proceeds to other aspects of the FLSA analysis.

### 3.    Because The Installers Do Not Plausibly Allege Their Wages, the Court Will Grant the QET Motion to Dismiss Count I

The Court will dismiss the Minimum Wage Claim because the Installers do not allege approximations of their wages to plausibly give rise to an entitlement of relief.

In considering a plaintiff's claim for nonpayment of minimum wage under 29 U.S.C. § 206, a plaintiff must show that: "(1) plaintiff was employed by the defendant, (2) plaintiff was engaged in interstate commerce . . . , (3) plaintiff was not compensated for all hours worked

---

[13] Although QET challenges the Amended Complaint's description of the Installers' roles, including their control over their work, commission, and schedule, the Court must, at this procedural juncture, "accept as true all of the factual allegations contained in the Complaint and draw all reasonable inferences in favor of [the Installers]." *Kensington*, 684 F.3d at 467.

during each work-week at a rate equal to or greater than the applicable minimum wage, and (4) none of the exemptions in 29 U.S.C. § 213 applied to plaintiff's position." *Seagram*, 62 F. Supp. 3d at 473 (citing 29 U.S.C. § 206). Such exceptions must be "narrowly construed against the employers seeking to assert them and . . . limited to those establishments plainly and unmistakably within the exemptions terms and spirit." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337–38 (4th Cir. 2008).

To state a claim for nonpayment of minimum wage under the FLSA, a plaintiff "must at least allege approximate wages such that the Defendants will be able to frame a meaningful response." *Seagram*, 62 F. Supp. 3d at 473 (citing *Walker v. Serv. Corp. Int'l.*, No. 4:10cv48, 2011 WL 1370575, at *7 (W.D. Va. Apr. 12, 2011) ("[A] wage and hour complaint, whether brought under the FLSA or as a breach of contract action, must at least allege approximate wages.")).

Even reading the Amended Complaint favorably, the Installers do not "allege approximate wages" that would allow the Court or QET to assess the plausibility of their Minimum Wage Claim under the FLSA. *Seagram*, 62 F. Supp. 3d at 473. "At this procedural juncture, a plaintiff may meet this initial standard by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility." *Hall v. DirectTV, LLC*, 846 F.3d 757, 777 (4th Cir. 2017) (internal citations omitted). The Installers do not allege more than mere labels and conclusions that QET paid "failed to pay them minimum wages" based on the Installers' commission payments. (*Id.* ¶ 27.) While possible that commission did not amount to minimum wage, absent even a statement as to average wages, the Installers do not present facts that would allow the Court to make a finding

16

that their allegations "cross the line between possibility and plausibility of entitlement to relief."

*Giacomelli*, 588 F.3d at 193 (internal quotation marks omitted).

Because the Installers do not allege even an approximation of their average commission

per their relative hours, the Court will dismiss Count I without prejudice.

### 4. Because the Installers Provide Conclusory Statements as to Their Pay Rate, the Court Will Grant the QET Motion to Dismiss Count II

The Court will dismiss the Overtime Wage Claim because the Installers do not even

allege average hours fail to state a claim for relief for payment.

In looking to a plaintiff's claim for nonpayment of overtime wages under 29 U.S.C.

§ 207, a plaintiff must plead: "(1) that he worked overtime hours without compensation; and

(2) that the employer knew or should have known that he worked overtime but failed to

compensate him for it." *Butler v. DirectSat USA, LLC*, 800 F. Supp. 2d 662, 667 (D. Md. 2011).

The Court follows the lenient approach detailed in *Butler*, requiring only that a plaintiff detail

"the types of work activities that occupied Plaintiffs' alleged overtime hours [in order to]

provide[] Defendants with sufficient notice of the basis of the allegations to form a response."

800 F. Supp. 2d at 668; *see also Rodriguez v. F & B Solutions LLC*, 20 F. Supp. 3d 545, 547

(E.D. Va. 2014) (noting "that a record of the precise number of hours worked is normally in the

possession of the employer and as such, can often be obtained through discovery").

Although the Installers need not allege the specific hours they worked in excess and did

not receive compensation for, they must still allege "sufficient factual content from which the

Court can infer [that a defendant] failed to pay overtime wages." *Peterson v. M.J.J., Inc.*, No.

16cv3629, 2017 WL 4098755, at *4 (D. Md. Sept. 13, 2017).  A plaintiff may meet this initial

burden "by estimating the length of [his or] her average workweek during the applicable period

and the average rate at which she was paid, the amount of overtime wages she believes she is

17

owed, or any other facts that will permit the court to find plausibility." *Hall*, 846 F.3d at 777 (internal citations omitted).

Here, the Installers proffer no such averages. They do not allege "sufficient factual content" to state a claim for overtime wages because they do not provide more than the fact that they allegedly worked in excess of forty hours a week. The Installers assert that QET "did not pay them or other similarly situated employees overtime compensation for hours worked in excess of forty (40) hours a week." (Am. Compl. ¶ 32.) As to their rate of pay, the Installers say only that QET paid them "on a 'commission' basis, irrespective of hours worked above forty (40) hours in an individual week." (*Id.* ¶ 35.) Although the Court notes that well-settled law does not require that the Installers "identify a *particular* week in which they worked uncompensated overtime hours," the Installers must "do more than merely allege that they regularly worked in excess of forty hours per week without receiving overtime pay." *Id.* (emphasis in original); *see also Rodriguez*, 20 F. Supp. 3d at 547 (noting "that a record of the precise number of hours worked is normally in the possession of the employer").

Under the proper lenient reading of what could constitute an overtime claim, the lack of allegations even as to average hours fall short of stating a claim. Without such facts, the Amended Complaint does not plausibly give rise to an entitlement to relief. Therefore, the Court will dismiss Count II without prejudice.[14]

---

[14] QET argues that the Installers qualify as "employees of a retail or service establishment" and therefore fall under an exemption to the FLSA because (1) their rate of pay amounts to an "excess of one and one-half times the minimum hourly rate applicable;" and, (2) more than half their compensation for a representative period "represents commissions on goods or services." 29 U.S.C. 207(i).

For the reasons stated above and because the necessary facts as to the Installers' rate of pay for the FLSA exemption do not "clearly appear on the face of the complaint," the Court finds QET's arguments inappropriate affirmative defenses at this procedural juncture. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *see also Corning Glass Works v. Brennan*, 417

**5.    Because QET Terminated Atkinson and Bratton After Learning of the Instant Action, the Court Finds That They Plausibly Allege That QET Retaliated Against Them**

Drawing all reasonable inferences in their favor, the Court finds that Plaintiffs Atkinson and Bratton[15] plausibly state a claim for retaliation because QET, after offering to bring them back onto work, terminated their contracts based on the instant action.

The FLSA protects a qualifying plaintiff from employer retaliation. "The retaliation provision of the FLSA is a central component of the Act's complaint-based enforcement mechanism." *Darveau*, 515 F.3d at 340. "To secure [employer] compliance with the substantive provisions of the FLSA, Congress chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied." *Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 363 (4th Cir. 2000) (quotations and citations omitted).

The retaliation provision renders it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). "The provision therefore effectuates enforcement of the Act's substantive provisions by removing fear of economic retaliation so that employees need not quietly accept substandard conditions." *Darveau* 515 F.3d at 340 (quotations and citations omitted).

Generally, the FLSA's "retaliation provision requires a plaintiff simply to allege and prove that a reasonable employee would have found the challenged action materially adverse,

---

U.S. 188, 196–97 (1974) ("the application of an exemption under the [FLSA] is a matter of affirmative defense.")

[15] Plaintiff Alley does not join in the Retaliation Claim. Alley worked with QET until February 25, 2019. (Am. Compl. ¶ 5.) Therefore, on May 20, 2020, at the time of the alleged retaliation, the Alley's term of employment with QET had already ended. (*Id.* ¶¶ 50–51.)

which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 342. As such, the FLSA's retaliation provision "must not be interpreted or applied in a narrow, grudging manner." *Ball*, 228 F.3d at 364. To establish a *prima facie* case of retaliation under the FLSA, a plaintiff must prove that he or she engaged in protected activity; that defendant took adverse action; and, that there is a causal connection between the protected activity and the adverse action. *Darveau*, 515 F.3d at 340.

Atkinson and Bratton plausibly allege all three elements of a retaliation claim pursuant to the FLSA. First, the Court finds that they engaged in a protected activity when they filed this collective action for alleged violations of the FLSA. *See id.* (noting that filing a complaint for alleged FLSA violations falls under "protected activity").

Second, the Court also finds that QET took adverse action against Plaintiffs Atkinson and Bratton when it terminated their employment. Section 215(a)(3) of the FLSA makes it unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act . . . ." 29 U.S.C. § 215(a)(3). The Amended Complaint states that Atkinson and Bratton remained furloughed when they filed the present action on May 19, 2020. (*See* Am. Compl. 3 n.3, ¶ 50.) On May 20, 2020, the next day, QET's owner reached out to Atkinson and Bratton to bring them back to work. (*Id.* ¶ 51.) The Amended Complaint says that, at 12:54 p.m., QET's owner text messaged Bratton, "Are you ready to start working." (*Id.*) Atkinson received a similar message about starting work "in Pennsylvania and Maryland." (*Id.*) Later, QET's owner reached out to both Atkinson and Bratton to let them know he had become aware of the present action and to inform them both they were "no longer welcome at QET." (*Id.* ¶ 52.) QET's

owner texted Atkinson, "our atty just reached out to us.  I guess you're looking for a lawsuit and working together?"  (*Id.*)  As to Bratton, QET's owner texted him:

> [Y]ou ended the relationship when you wanted to sue us. . . .
>
> The moment you decided to sue us, you're claiming that you're being mistreated and underpaid.  So yes, you are ending your relationship with us.

(*Id.* ¶ 54.)  Because the FLSA prohibits an employer from "discharge[ing] or in any other manner discriminat[ing] against any employee," the Court concludes that Plaintiffs Atkinson and Bratton amply state a claim that QET retaliated against them.  29 U.S.C. § 215(a)(3).

Finally, Plaintiffs Atkinson and Bratton plausibly allege that a "causal connection" between their protected activity and QET's refusal to return them from furlough exists. *Darveau*, 515 F.3d at 340.  Relevant here, QET's owner said, "Yes, I did remove you after your lawsuit.  What's there to pretend about?" (Am. Compl. ¶ 54.)  Plainly, a causal connection exists between their filing of the instant action and QET's termination of their contracts.  *See Reardon v. Herring*, 201 F. Supp. 3d 782, 784 (E.D. Va. 2016) (a plaintiff may establish a *prima facie* showing of causality by putting forth facts to support "that the retaliation closely followed the protected activity.")

Because Plaintiffs Atkinson and Bratton state a claim that QET retaliated against them, the Court will deny the QET Motion to Dismiss Count III.

### B.     **The Court Will Grant the Motion to Dismiss the Counterclaims**

In the Installers' Motion to Dismiss Counterclaims, the Installers challenge both the form and substance of the Counterclaims.  Most persuasively, the Installers argue that QET's six Counterclaims do not sufficiently relate to the Installers' FLSA claims, pointing to case law in which courts have been hesitant to allow employers to file counterclaims for monetary damages against employees who bring FLSA claims against them.  (*See* Mem. Supp. Mot. Dismiss

Countercls. 2, ECF No. 13.)  The Court first considers whether the Counterclaims are compulsory or permissive, finding all counterclaims to be permissive.  As such, the Court finds that because the permissive counterclaims lack an independent basis for subject matter jurisdiction in this Court, and in light of FLSA policy concerns, the Court will dismiss the Counterclaims in their entirety.

### 1.    Legal Standard:  Compulsory and Permissive Counterclaims

The burden of proving subject-matter jurisdiction lies with the party asserting that jurisdiction is proper.  *See Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  Notably, the Federal Rules of Civil Procedure instruct that "[i]f the Court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

Where neither diversity nor federal question jurisdiction exists over a counterclaim, a counterclaim's designation as "compulsory" or "permissive" determines a federal court's jurisdiction.  *Painter v. Harvey*, 863 F.2d 329, 331 (4th Cir. 1988).  A compulsory counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim," while a permissive counterclaim does not.  *See* Fed. R. Civ. P. 13(a)(1)(A).[16]

---

[16] Federal Rule of Civil Procedure 13 provides, in pertinent part:

> A pleading must state as a counterclaim any claim that—at the time of its service— the pleader has against an opposing party if the claim:  (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a)(1).

Accordingly, a compulsory counterclaim falls "within the ancillary jurisdiction of the Court to entertain and no independent basis of federal jurisdiction is required." *Painter*, 863 F.2d at 331. By contrast, a court does not have jurisdiction over a permissive counterclaim that lacks its own independent jurisdictional basis. *Williams v. Long*, 558 F. Supp. 2d 601, 603 (D. Md. 2008) (noting that Rule 13's requirement that the claim and counterclaim "arise[] out of the [same] transaction or occurrence" equates to 28 U.S.C. § 1367(a)'s requirement that the claim and counterclaim be "so related . . . that they form part of the same case or controversy under Article III of the United States Constitution").

To determine whether a counterclaim qualifies as compulsory, the Fourth Circuit applies a four-factory inquiry:

> (1) Are the issues of fact and law raised in the claim and counterclaim largely the same?  (2) Would *res judicata* bar a subsequent suit on the party's counterclaim, absent the compulsory counterclaim rule?  (3) Will substantially the same evidence support or refute the claim as well as the counterclaim? and (4) Is there any logical relationship between the claim and counterclaim?

*Painter*, 863 F.2d at 331. "A court need not answer all these questions in the affirmative for the counterclaim to be compulsory." *Id.* "Rather, the tests are less a litmus, more a guideline." *Id.*

### 2. Because the Counterclaims Do Not Arise Out of the Same Transaction or Occurrence as the Installers' FLSA Action and No Independent Basis for Jurisdiction Exists, the Court Will Dismiss the Counterclaims

Even reading in a light most favorable to QET, the Court concludes that the Counterclaims lack an independent basis for subject matter jurisdiction in this Court as permissive counterclaims. In cases where employers have filed counterclaims relating only to an employee's work performance in response to an FLSA complaint, "[f]ederal courts have been reluctant to exercise supplemental jurisdiction over state law claims and counterclaims in the

context of a FLSA suit where the only connection is the employee-employer relationship."

*Williams*, 558 F. Supp. 2d at 604 (collecting cases).

### a.   The Issues of Fact and Law Are Not "Largely the Same" Between the Amended Complaint and the Counterclaims

As to the first *Painter* inquiry, the Court finds that the issues of fact and law raised in the Amended Complaint and Counterclaims are not "largely the same." *Painter*, 863 F.2d at 331.[17]

Notably, the only facts directly related to the Installers' FLSA claims arise from the employer-employee relationship between QET and the Installers. QET brings the six Counterclaims based on damages allegedly "suffered by QET as a direct result of wrongdoing and misconduct engaged in by [the Installers] while acting . . . on behalf of QET." (Countercls. ¶ 1.) QET alleges that the Installers negligently installed QET products, breached their duties to engage in industry standards, defrauded and stole from QET, and defamed QET. (*Id.* ¶¶ 6–13.) While the Installers' claims center upon QET's wage and overtime payment under the FLSA, the Counterclaims arise entirely from the Installers' alleged actions during certain jobs tasked to them by QET. The Counterclaims thus speak to the Installers' duties under their employment

---

[17] Although Alley allegedly stated that QET "stole" from him and was scamming people, such allegations do not sufficiently relate to the Amended Complaint to deem it a compulsory counterclaim. *Painter*, 863 F.2d at 329. In *Painter*, the Fourth Circuit found that plaintiff's excessive force claim involved the same questions and evidence as defendant's defamation counterclaim. 863 F.2d at 331–32 (finding that all the evidence focused on "a single factual issue—what transpired during [plaintiff's] arrest"). There, the defendant police officer brought a defamation counterclaim for plaintiff's statements in a local newspaper about the alleged assault subsequent to her arrest, the same incident on which plaintiff based her pending excessive force claim. *Id.*

Unlike *Painter*, QET's claim of defamation does not rise or fall wholly on the facts in the Amended Complaint. While Alley's statement that QET "stole" from him might implicate whether QET refused to pay him minimum wage and overtime payments, that inference is less reasonable when placed alongside Alley saying that QET was "scamming people" and had "shady business practices." (Am. Compl. ¶ 12.) These statements do not rest at all on the same factual questions as the Installers' FLSA claims.

contracts and defamation law—not the FLSA. Nowhere in the Amended Complaint does QET invoke any facts as to the Installers' hours or compensation. In fact, QET adds facts claiming that it *overcompensated* the Installers who allegedly at some point submitted fraudulent invoices to increase their commission payments. Indeed, QET demands $1,350,000 in recompense for these additional events.

Therefore, even drawing all inferences in QET's favor, such allegations are not "largely the same" as those brought by the Installers in the Amended Complaint. *Williams,* 558 F. Supp. 2d at 604 (finding that counterclaims for breach of contract, breach of fiduciary duty, and invasion of privacy did not arise out of "largely the same" factual and legal issues). As such, the Court answers the first *Painter* inquiry as to whether the claim in compulsory in the negative.

> **b.** ***Res Judicata* Would Not Bar a Subsequent Suit on the Counterclaims**

As to the second *Painter* inquiry, the Court concludes that *res judicata* would not bar a subsequent suit on the Counterclaims. *Painter,* 863 F.2d at 331. Under Virginia law, *res judicata* encompasses:

> [a] party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence . . . .

*Bennett v. Garner*, 913 F.3d 436, 440 (4th Cir. 2019).

While a subsequent action on the Counterclaims would involve the same opposing party and quite possibly a final judgment, it would not involve a cause of action that "arises from that same conduct, transaction or occurrence." *Id.* As the Court previously observed, the Counterclaims do not involve the "largely the same" factual or legal questions. *See Williams,*

25

558 F. Supp. 2d at 604. Therefore, the Court answers the second *Painter* inquiry in the negative, weighing against a finding that the Counterclaims are compulsory.

### c.   The Counterclaims Would Not Involve Substantially the Same Evidence as That in the Amended Complaint

As to the third *Painter* inquiry, the Court finds that the Counterclaims, even read favorably, would not involve "substantially the same evidence" as the Installers' FLSA claims. *Painter*, 863 F.2d at 331.

The Installers' FLSA claim would necessarily rely on evidence demonstrating QET's commission payments and the Installers' hours worked. In contrast, the Counterclaims will rely on altogether different evidence, with the exception of the Installers' employment terms. The evidence surrounding the Counterclaims would presumably include documentation of customer's complaint, said job invoices versus work performed by the Installers, and testimony as to Plaintiff Alley's alleged defamatory statements. Accordingly, unlike the situation in *Painter*— where all the evidence focused on "a single factual issue—what transpired during [plaintiff's] arrest"—here, the evidence supporting or refuting the FLSA claims and Counterclaims would prove to be significantly different. 863 F.2d at 332. As such, the Court answers the third inquiry in the negative because the Counterclaims would not involve "substantially the same evidence" as the Installers' FLSA claims. *Painter*, 863 F.2d at 331.

### d.   The "Logical Relationship" Between the Amended Complaint and the Counterclaims Is Tangential at Best

As to the fourth and final *Painter* inquiry, the Court finds that, even in a light most favorable to QET, the "logical relationship" between the Amended Complaint and the Counterclaims is tangential at best and therefore does not persuade. *Painter*, 863 F.2d at 331. While the Installers' claims seek minimum wage and overtime payments for the hours the

Installers allegedly worked, QET's Counterclaims seek compensation for allegedly negligent work, fraudulent job invoices, and defamation almost entirely unrelated to the Installers' FLSA claims. Here, the Installers' time spent working for QET amounts to the only logical connection between their FLSA claims and the Counterclaims. As discussed above, numerous federal courts have refused to exercise supplemental jurisdiction over counterclaims to a FLSA claim wherein subject matter jurisdiction heavily depends on the "employer-employee relationship" to "single-handedly create[] a common nucleus of operative fact . . . ." *Wilhelm v. TLC Lawn Care, Inc.*, No. 07cv2465, 2008 WL 640733, at *3 (D. Md. Mar. 6, 2008.) The Court agrees with this analysis and answers the fourth *Painter* inquiry in the negative.

In sum, the Court concludes that despite drawing all reasonable inferences in QET's favor, the Counterclaims do not stem from the same transaction or occurrence as the Installers' FLSA claims and amount to permissive counterclaims under Rule 13. Therefore, the Court therefore lacks jurisdiction pursuant to 28 U.S.C. § 1367(a). The Court notes that the four-part inquiry applied here is "less a litmus, [and] more a guideline." *Painter*, 863 F.2d at 331. Importantly, Congress enacted the FLSA to "secure [employer] compliance" with the FLSA, *Ball*, 228 F.3d at 363, and therefore "remov[e] fear of economic retaliation so that employees need not quietly accept substandard conditions," *Darveau* 515 F.3d at 340. "Generally speaking, courts have been hesitant to permit an employer to file counterclaims in FLSA suits for money the employer claims the employee owes it, or for damages the employee's tortious conduct allegedly caused." *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 740 (5th Cir. 2010). "To permit [the employer] in such a proceeding to try [its] private claims, real or imagined, against

27

[its] employees would delay and even subvert the whole process."[18]  *Donovan v. Pointon*, 717

F.2d 1320, 1323 (10th Cir. 1983).

Because the Court answers the *Painter* four inquiries in the negative and in consideration

of the purpose of the FLSA, the Court finds that QET's Counterclaims amount to permissive

counterclaims.  Therefore, because no other independent basis of jurisdiction exists,[19] the Court

must dismiss the Counterclaims in their entirety.  *See* Fed. R. Civ. P. 12(h)(3).

### IV.  Conclusion

For the foregoing reasons, the Court will grant the QET Motion to Dismiss Counts I and

II, but deny the Motion as to Count III.  (ECF No. 8.)  The Court will grant the Motion to

Dismiss Counterclaims.  (ECF No. 12.)

An appropriate Order shall issue.

_____
M. Hannah Lauck
United States District Judge

Date: 3/29/21
Richmond, Virginia

---

[18] In particular, the Fourth Circuit has overturned a district court's dismissal for retaliation where an employer filed a state lawsuit "with a retaliatory motive and without basis in law or fact" against a plaintiff who engaged in a protected activity.  *See Darveau*, 515 F.3d at 343.  In that case, the Fourth Circuit noted that retaliation does not require a plaintiff to prove "that his [or her] employer retaliated against him [or her] with a materially adverse *employment* action."  *Id.* (internal quotations and citations omitted) (emphasis added).  Instead, the Court need only find that the action at issue "would have been materially adverse to a reasonable employee because the employer's actions could well dissuade a reasonable worker form making or supporting a charge of discrimination."  *Id.* (internal quotations and citations omitted).

[19] Although the Counterclaims' amount in controversy exceeds $75,000, the Parties lack diversity where QET operates as "a limited liability company organized and existing under the laws of Virginia," and the Installers reside in Virginia.  (Countercls. ¶¶ 2–3.)  This Court lacks diversity jurisdiction over the Counterclaims.  *See* 28 U.S.C. § 1332.  Also, the Counterclaims, all of which are plead pursuant to Virginia law, do not present a federal question.  *See* 28 U.S.C. § 1331.